IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

**FILED**

MAR 3 1 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

SHARON K. LEWIS, ELAINE JACKSON )
and ELIZABETH BUSH )
 )
    **Plaintiffs,** )
 )
**v.** )
 )
NORTHPORT HEALTH )
SERVICES, INC. )
 )
    **Defendant.** )

CIVIL ACTION NUMBER

00-C-593-W

**ENTERED**

APR - 1 2002 

## MEMORANDUM OPINION
## GRANTING PARTIAL SUMMARY JUDGMENT TO DEFENDANT

The present action was initiated by three black former employees of defendant, Northport

Health Services, Inc. ("Northport"), located in Cordova, Alabama.  Plaintiffs bring federal

discrimination claims against Northport, *see* 42 U.S.C. 2000e, *et. seq.*; 42 U.S.C. § 1981, along

with Alabama tort claims.

Presently before the Court are motions for summary judgment by Northport, as well as

motions for partial summary judgment by each plaintiff. [1]  The Court finds that Northport is

entitled to partial summary judgment.  Specifically, Northport is entitled to summary judgment

on: 1) the retaliation and promotion claims made by plaintiff, Elaine Jackson, 2) the retaliation

---

[1]  The Court is alarmed at the amount of paper wasted to bring these dispositive motions
before this Court: six briefs each for the three individual plaintiffs, along with at least five total
evidentiary submissions.  While some of the circumstances surrounding each plaintiffs' claims
were unique, several arguments made by both defendant and Plaintiffs were merely repeated
verbatim in the briefs for each individual plaintiff.  Surely the parties could have been more
efficient with their time and resources, as well as the Court's time.

/20

and constructive discharge claims made by plaintiff Sharon Lewis, and 3) all of the claims made by plaintiff Elizabeth Bush.   Plaintiffs' motions for partial summary judgment are due to be denied.

## I. THE DEFENDANT

Northport is a long-term nursing care facility with 114 beds and a ninety-two to ninety-five percent occupancy rate.  At the time of the events at issue, Northport  had a general grievance policy, an "equal opportunity" policy, and a sexual harassment policy, (Estes Dep. at pp. 71-72; *id.* at Ex. 1, pp. 3, 12-13, 17-18), but the facility did not have a racial harassment policy.  (*See* Estes Dep. at Ex. 1.)  According to a Northport official, racial harassment is considered a "Type A" or terminable offense.  (Burchfield Dep. at p. 100; *see* Estes Dep. at Ex. 1, pp. 12-13.)  The Court notes, however, that the employee handbook does not specifically proscribe racial harassment.  Rather, the handbook proscribes "inappropriate behavior with the public, residents, or staff."  (Estes Dep at. Ex. 1, p. 16.)

## II. PLAINTIFF ELAINE JACKSON

Plaintiff Elaine Jackson ("Jackson") initially alleged the following claims: 1) failure to promote, 2) hostile environment based upon race, 3) retaliation based upon her termination, and 4) negligent retention and supervision.  She has subsequently agreed to dismiss her promotion claim.  (Doc. 106, Jackson's Resp. to Def.'s Mot. for Summ. J. at p. 18.)  Thus, her only remaining claims are for hostile environment, retaliation/termination, and negligent supervision and retention.

A.    Employee and Patient Racial Slurs.

Jackson was employed at Northport from 1984 through August 1999 as a Certified

Nursing Assistant ("CNA").  In her capacity as a CNA, Jackson assisted nurses with patient care

by taking patients' vital signs, turning bedridden patients in an effort to avoid bed sores, bathing

patients and feeding them.

During her deposition, Jackson testified that both Northport employees and patients made

"a lot of racial statements  ...  all the time." (Jackson Dep. at pp. 163-64.)  Jackson testified that

a white nursing supervisor, Virginia Tell, referred to Jackson as a "black widow" and made

comments such as "get [your] black face into my office." [2]  Tell made these comments on more

than one occasion. (Jackson Dep. at pp. 104, 107, 112-13, 126, 128, 129-30, 188. )  Jackson

complained to a Northport administrator about the comments, (Burchfield Dep. at 46), but the

administrator told Jackson that she did not have any rights, "only patients had rights." (Jackson

Dep. at pp. 118-19.)  Two other employees, Pat McCandless and Ruby Frey also used the phrase

"your black face" while referring to Jackson. [3]  (Jackson Dep. at pp. 186, 236, 247.)

Another employee, Betty Lowery, stated that she hated to see her daughter dating a black

man.  Two other employees agreed, commenting that they would not want their daughters dating

black men. (Jackson Dep. at pp. 244-46.)   Carrie Preston suggested that her husband might fix

Jackson's car window after several Northport employees suffered damage to their cars, which

---

[2] On a motion for summary judgment, the Court must view all the facts in the light most
favorable to the non-movant. *DeJulio v. Georgia*, 276 F.3d 1244, 1258 (11th Cir. 2001).

[3] During Jackson's employment, she learned of other racial slurs made by Frey.
(Jackson Dep. at pp. 247-48.)  The Court will discuss the "Frey incident" when addressing the
claims made by plaintiff, Sharon Lewis.

were parked in the Northport parking lot. Preston said that her husband didn't like "y'all kind," so Preston would have to take the car for repairs, rather than Jackson. (Jackson Dep. at pp. 241-43.)

Jackson heard employee Delora Cagle comment that she had worked so hard in her yard that she smelled like a nigger." (Jackson Dep. at pp. 185, 234.) Clara Harris also used the word "nigger" in Jackson's presence. (Jackson Dep. at pp. 185-86.) Harris later apologized, but Jackson was told that Harris subsequently used the slur again. (Jackson Dep. at pp. 185-86.) Lee Hicks commented that she and her husband often saw a "patch of niggers" when driving home on a particular road. (Jackson Dep. at pp. 228-26, 32-33.) Even though Jackson voiced her objection to the comment, she was told that Hicks used the same slur in the presence of other black CNAs on a daily basis. (Jackson Dep. at pp. 263-64, 229-30.) Jackson complained about the employee comments, but none of the employees were disciplined, except for Frey who ultimately admitted using a slur. (Jackson Dep. at pp. 115-19, 126-27, 129-30, 166-67; *see* Brewer Dep. at pp. 162, 164-65.)

In addition to employee use of racial slurs, Jackson testified that patients often used the word "nigger" and other racial slurs, such as "nigger bitch." (Jackson Dep. at pp. 168-69, 185.) On a daily basis, Della Smith called Jackson a "nigger gal," or "nigger bitch" and made comments such as why are your "hands so black" and "[h]ere comes nigger." (Jackson Dep. at pp. 188-92.) During the deposition, Jackson was asked if Smith was in her "right mind" when she made these comments. Jackson testified that Smith recognized the employees and the administrator by name. (Jackson Dep. at pp. 194.) Moreover, while Smith called all of the employees "bitch," she never used racial slurs when addressing the white employees. (Jackson

4

Dep. at pp. 193-94, 200.) Jackson complained about Smith's comments and asked for reassignment to another section of the facility. However, for "a long time" Jackson was told to "calm down." (Jackson Dep. at pp. 193, 197-98.) Eventually, Smith was moved to another area of the facility, but Jackson does not know whether the move was in response to her complaints or whether the move was for some other reason. (Jackson Dep. at pp. 197-98.)

In addition to using the word "nigger," patient Zelzie Blalock frequently commented that Jackson "was made for the outside." Therefore, Blalock could not understand why "they let something like [Jackson] live in a house." (Jackson Dep. at pp. 201-04.) Jackson also overheard Blalock make similar comments to other black CNAs. (Jackson Dep. at pp. 214-15.) Jackson complained about Blalock, but again was told to "calm down." (Jackson Dep. at pp. 212-13.) Eventually, staff assignments were changed after Northport completed a renovation project. As a result of these changes, Jackson moved down the hall away from Blalock. (Jackson Dep. pp. 211-12.)

Another patient, Hardy Naramore, threw a picture of water in Jackson's face and made comments such as "you better get your black ass out of here." (Jackson Dep. at pp. 219-21.) After he began to like Jackson, he made such comments less frequently. (Jackson Dep. at pp. 220-21.) Eventually, Jackson's move down the hall took her away from Naramore. However, she observed black CNAs coming out of Naramore's room crying, after he made racist comments and threw water on them. (Jackson Dep. at pp. 219-22.) Jackson testified that several black CNAs resigned because they could not tolerate the treatment they received from Naramore. (*Id.* at pp. 219-20.) Jackson is unaware of Naramore using racial slurs in the presence of white employees or throwing water at them. (*Id.*) Mr. Palmer, another patient, also

5

used the word "nigger" frequently and told Jackson to "get [her] black ass out of [his room]." (Jackson Dep. at pp. 223-24.)

In addition to complaining about these incidents, Jackson often cried about the incidents in the presence of Northport employees and supervisors. (Jackson Dep. at pp. 106, 113, 126, 169, 307, 310-13; *see* Burchfield Dep. at p. 46.) Despite Jackson's requests for reassignment, the record contains no evidence that Northport reassigned Jackson in response to her complaints about the patients' racist comments. (*See* Brewer Dep. at p. 63.)


B.   <u>Jackson's Termination.</u>

After fifteen years of employment with Northport, Jackson was terminated as a result of a patient complaint. (Doc. 80, Daniel 5/15/01 Aff. at ¶ 6 & Ex. E.) On August 4, 1999, the patient complained that Jackson used the word "fuck," talked "ugly" to the patient and refused to wash the patient's rear end. (Daniel 5/15/01 Aff. at Ex. E.) That same day, Beth Brewer, the Director of Nursing ("DON"), suspended Jackson pending investigation of the complaint. In the suspension report, Brewer spelled out the specific allegations, indicating that such behavior was "unacceptable" and made the following notation: "[i]ncident reported to DLC." (*Id.*) The following day, August 5, Brewer completed a "Resident Abuse, Negligent or Exploitation Investigative Report" where, for the first time, she described Jackson's conduct as "verbal abuse." (*Id.*) Resident abuse is a "Type A" offense, violation of which subjects an employee to discipline up to, and including, immediate termination without warning. (Estes Dep. at Ex. 1, p. 16.)

Northport Regional Administrator, Linda Thursby (now Linda Daniel), conducted the

investigation into the allegations against Jackson. (Daniel 5/15/01 Aff. at Ex. E.) When Jackson was questioned about the incident, she denied cursing patients and identified three CNAs, one of whom had always been in the room while Jackson was with patients. (Jackson Dep. at pp. 377-78; *see* Daniel 5/15/01 Aff. at ¶ 6 & Ex. E.) Thursby interviewed the named CNAs, who stated that they had indeed overheard Jackson curse patients and/or curse at employees in the presence of patients in the past. (*Id*. at Ex. E.) Thursby obtained written statements from the named CNAs, along with written statements from all the employees who had witnessed the patient making the complaint. Thursby indicates that she made the decision to terminate Jackson for "resident abuse" after reviewing the information documented in the investigation file. (Daniel 5/15/01 Aff. at ¶ 6.) In addition to the documents relating to the abuse investigation, the file contained Jackson's three year old disciplinary warning for insubordination and boisterous behavior. (*See* Daniel 5/15/01 Aff. at ¶ 6 & Ex. E.)

C.     Retaliation Claim.

Jackson first claims that her termination was in retaliation for her constant complaints about both employee and patient racial slurs. (*See, e.g.*, Jackson Dep. at pp. 180-82.) Jackson testified that Northport "was always trying to find a reason to get rid of" her. (Jackson Dep. at p. 180.) Jackson can establish a prima facie case of discrimination if she can show: 1) that she engaged in protected activity, 2) that she suffered an adverse employment action, and 3) that the adverse employment action was causally related to the protected activity. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

Northport argues that Jackson has not made out a prima facie case for discrimination.

7

First, argues Northport, Jackson did not engage in protected activity because no reasonable person could have believed that the conduct about which she complained constituted unlawful harassment. As discussed below, this argument has no merit. Next, Northport argues that Jackson failed to establish a causal connection between her complaints and her termination.

On this latter point, the Court agrees. Jackson points to no evidence which might tend to show that her complaints led to her termination. Jackson admitted that she regularly complained to Northport about racial slurs and racial discrimination throughout her fifteen years of employment. (Jackson Dep. at pp. 307, 406-07.) She also admitted that she had been disciplined on various occasions throughout her employment with Northport. (Jackson Dep. at pp. 98-99.) After fifteen years of complaints and fifteen years of discipline short of termination, Jackson provides no evidence that Northport suddenly tired of her complaints and decided to "get rid of her." In other words, Jackson's protected activity and her termination appear to be "wholly unrelated." *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("To establish a causal connection, a plaintiff must show ... 'that the protected activity and the adverse action were not wholly unrelated.'") (citation omitted).

Moreover, Jackson's failure to the address the causation element of her retaliation claim in her reply brief is fatal to her claim. (*See* Doc. 106, Jackson Resp. To Def.'s Mot. for Summ J.) Rather than address Northport's arguments, Jackson focused her response solely on comparisons between the events surrounding the actual termination and the events surrounding the terminations of comparators. (*Id.* at pp. 11-16.) Because she failed to even mention retaliation in response to Northport's summary judgment challenge, Jackson abandoned her retaliation claim. *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*,

10 F.3d 1563, 1568 (11th Cir. 1994) (noting that "a ground not pressed in the district court in opposition to a motion for summary judgment is to be treated by the district court as abandoned") (citation omitted).  Therefore, Northport is entitled to summary judgment on Jackson's retaliation claim.

D.    Termination Claim.

Jackson next complains that her termination was the culmination of disparate treatment by Northport.  (Jackson Dep. at pp. 179, 182-83, 313-14, 343-44, 401, 406, 406.) To establish a prima facie case for termination Jackson must show: 1) that she belongs to a protected class, 2) that she was qualified for her job, and 3) "that the misconduct for which [Northport] discharged [Jackson] was the same or similar to what a similarly situated employee engaged in, but that [Northport] did not discipline the other employee similarly." *Lathem v. Dept. of Children and Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999) (citation omitted).  If Jackson establishes a prima facie case for termination, Northport must come forward with a legitimate non-discriminatory reason for disciplining Jackson and the similarly situated employee differently. *See id.* at 793.  Jackson is entitled to survive summary judgment if she has evidence from which a fact finder might determine that Northport's "legitimate" non-discriminatory reason for the differential treatment was pre-textual. *See Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).

The Court finds that Jackson has sufficient evidence to establish pre-text with respect to similarly situated employee Leona Buzbee, a white CNA, whom Northport did not terminate. (*See* Brewer Dep. at pp. 168-69, 180.)  In 1996, Buzbee was disciplined for "discourteous

9

treatment of a resident" after Buzbee scolded a patient for trying to get out of bed. (Brewer Dep. at pp. 170-71 & Ex. 7.) The patient's family member reported that Buzbee "talked ugly" to the patient and made her cry. (Brewer Dep. at Ex. 8.) Northport gave Buzbee a verbal warning for this infraction. (Brewer Dep. at p. 171 & Ex. 7.)

A little over one year later, Northport disciplined Buzbee again for discourteous treatment of a resident. This time she was charged with a "Type B violation: Discourteous treatment of a resident. [The r]esident asked Ms. Buzbee to change her bed sheets after she had an accident on them. Ms. Buzbee told the resident that she was capable of changing her sheets herself." (Brewer Dep. at Ex. 9.) As a result of this second incident, Buzbee was given her first written warning. (Brewer Dep. at p. 172 & Ex. 9.)

The final incident occurred less than three months later. Buzbee was accused of "turning [a patient] from side to side very roughly," "banging [the patient] into the side rails" during the course of turning her and telling the patient to "shut up." (Brewer Dep. at pp. 173-74 & Ex. 10.) Northport officials characterized this incident as a "Type B violation: Discourteous treatment of residents" and treated the discipline as a second written warning. (Brewer Dep. at p. 174 & Ex. 10.) Buzbee was warned that further violations would result in either probation, along with a third warning, or termination. (Brewer Dep. at p. 174 & Ex. 10.) Less than one year later Buzbee resigned from Northport, without giving notice. (Brewer Dep. at pp. 168-69, 180 & Ex. 11.)

Beth Brewer, as the DON, signed off on all three of the disciplinary actions taken against Buzbee, as well as Jackson's termination. (See Brewer Dep. at pp. 170-71, 173-4; Daniel 5/15/02 Aff. at Ex. E.) When asked why Buzbee's conduct did not warrant termination, Brewer

responded that Buzbee was initially accused of scolding the patient and, therefore, only given a verbal warning. (Brewer Dep. at p. 175.) The second incident, where Buzbee refused to change the sheets, might have involved Buzbee "trying to get [the patient] to her highest level of function," hypothesized Brewer. (Brewer Dep. at p. 175.) The final incident, where Buzbee was accused of banging the patient on the bed rails, did not warrant termination because Buzbee denied the conduct. (Brewer Dep. at p. 176 & Ex. 10.) Further, explained Brewer, Buzbee's conduct was not

> a deliberate cursing abusive type thing. She was turning her and in the course of her care with her the resident said she was rough and banged her into the bed.... If she had been accused of abuse, she wouldn't have been allowed to continue to work .... [T]he patient did not accuse [Buzbee] of abuse. [The patient] just said that [Buzbee] was rough in the line of duty.

(Brewer Dep. at pp. 175-78) (emphasis supplied).

Despite Northport's attempt to downplay the gravity of Buzbee's conduct, a reasonable fact finder might determine that her conduct was "of comparable seriousness to the conduct for which [Jackson] was discharged." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (explaining the standard for establishing that two employees are similarly situated). Jackson was terminated for patient abuse after allegedly cursing a patient and failing to properly bathe her. Buzbee, on the other hand, received a warning after allegedly rough handling a patient, bumping the patient's head against the bed rails, and telling the patient to "shut up." According to provisions found in the employee handbook, the type of discipline Northport imposed for such misconduct turned on whether Jackson and Buzbee's actions were characterized as "discourteous treatment" of residents or "resident abuse." The employee handbook provides that "[d]iscourteous treatment of a resident" is a "Type B" offense which warrants termination only

11

after a third written warning and probation. (Estes Dep. at Ex. 1, p. 17.) In contrast,

"[i]nappropriate behavior with the public, residents or staff," and "resident abuse" are "Type A"

offenses, which can result in immediate discharge without prior warning. (Estes Dep. at Ex. 1, p.

16.) Northport characterized Jackson's cursing and improper bathing of a patient as "resident

abuse" while characterizing Buzbee's rough handling of a patient as "discourteous treatment."

How Northport determines which conduct constitutes "discourteous treatment," rather

than "resident abuse" is unclear because the employee handbook provides no explanation for

how to distinguish the two. Apparently, Northport would have this Court believe that the facility

characterizes employee misconduct according to the label placed on the conduct by the patient.

Brewer testified that Jackson was accused of abuse, but "the patient did not accuse [Buzbee] of

abuse. [The patient] just said that [Buzbee] was [physically] rough in the line of duty." (Brewer

Dep. at pp. 175-78.)

Yet, Northport has no evidence that the patient actually accused Jackson of "abuse."

Brewer suspended Jackson on August 4, pending investigation of a complaint about "using ugly

language to a patient." (Brewer Dep. at p. 153; Daniel 5/15/01 Aff. at Ex. E .) On the same

date as the suspension, Brewer memorialized the complaint against Jackson, but never used the

word "abuse." (*Id.*) Indeed, the term "abuse" does not appear in the termination documents

until the following day, August 5, when Brewer completed the abuse investigation report. (*See*

*id.*)

Even if the patient had actually accused Jackson of "abuse," Brewer's own testimony

contradicts the illogical explanation that Northport relies on patient characterizations of

employee misconduct when determining if the employee engaged in patient abuse. Brewer

testified that an accusation of being rough is not considered an allegation of "physical" abuse. (Brewer Dep. at pp. 178-79.) She then discussed an "abuse manual" that purportedly describes what conduct constitutes patient abuse. (Brewer Dep. at pp. 178-79.) Northport has not offered any evidence that this manual categorizes the type of misconduct in which Jackson engaged as abuse. Indeed, Northport has failed to offer any objective evidence in support of the facility's decision to characterize Jackson's cursing and failure to properly bathe a patient as "abuse," while characterizing Buzbee's rough handling of a patient as "discourteous treatment," a less serious infraction.

While an employer has a "right to interpret its rules as it chooses," the employer must do so in a non-discriminatory manner. *Nix v. WLCY Radio/Rahal Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Because Northport provided an illogical explanation for how the facility interpreted its rules and Northport failed to provide any objective evidence in support of its interpretation, a reasonable fact finder might determine that Buzbee's "discourteous treatment" in the form of rough handling, was actually far more serious than Jackson's purported " verbal abuse." Thus, the two women were similarly situated for purposes of establishing Jackson's prima facie case of disparate treatment.

In its brief, Northport attempts to distinguish Jackson's circumstances from Buzbee's by noting that Jackson had been disciplined for discourteous treatment of a patient prior to her termination. (*See* Jackson Dep. at Ex. 18.) Northport cannot rely on this disciplinary action to support the facility's termination of Jackson for two reasons. First, Northport proffered no evidence that its decision makers considered Jackson's prior discipline for discourteous treatment when they made the termination decision. Thursby explained that she made the

13

decision to terminate Jackson after reviewing the documents she collected during the course of the abuse investigation. (Daniel 5/15/91 Aff. at ¶ 6.) However, the investigation file Thursby complied does not include any documentation of Jackson's prior discipline for discourteous treatment. (*Id.* at Ex. E). Rather, the file contains Jackson's three year old disciplinary warning for insubordination and boisterous behavior. (*See* Daniel 5/15/01 Aff. at Ex. E.) Similarly, Brewer's testimony indicates that she did not consider Jackson's prior discipline for discourteous treatment. During Brewer's deposition, she did not refer to any prior discipline when explaining why Northport terminated Jackson, but not Buzbee. Instead, Brewer justified Northport's differential treatment of the two women by explaining that Buzbee had not been accused of "abuse" by the patient. "[A]n employer may not satisfy its burden of produc[ing a legitimate non-discriminatory reason] by offering a justification which the employer either did not know or did not consider at the time the decision was made." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (citations omitted).

Even if Northport had considered Jackson's prior discipline for discourteous treatment, this justification for Jackson's termination is highly suspect because both Buzbee and Jackson had been previously disciplined for this same infraction: Jackson <u>five</u> years prior to her termination and Buzbee <u>six months</u> prior to her warning for rough handling a patient. (*See* Jackson Dep. at Ex. 18; Brewer Dep. at Ex. 9.) Indeed, Buzbee had previously been disciplined <u>twice</u> for the same misconduct, while Jackson had previously been disciplined only once. (*See* Jackson Dep. at Exs. 9-21; Brewer Dep. at Exs. 7-11.) Accordingly, the record contains evidence that Northport's "legitimate" non-discriminatory reasons for retaining Buzbee and terminating Jackson may have been pretextual. Jackson's termination claim, therefore, survives

14

summary judgment. [4]

D.   Hostile Work Environment Claim.

To establish a claim for racial harassment, Jackson must show that the challenged conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1986). Northport argues that Jackson fails to make out a prima facie case for discrimination because the conduct about which she complains was not sufficiently "severe or pervasive." First, Northport contends that Jackson has no actionable claim relating to the employee comments because they were isolated incidents that did not rise to the level of harassment. Without the employee comments, Jackson has only the patient comments upon which to rely. Citing a recent Fifth Circuit Court of Appeals case, Northport contends that racial comments by elderly sick patients cannot, as a matter of law, sustain a hostile environment claim. *See Cain v. Blackwell,* 246 F.3d 758 (5th Cir. 2001). In the alternative, Northport argues that it cannot be held liable for patient or employee comments because Northport was not aware of all the employee conduct and Northport took all possible remedial steps to remedy the problem with the patients.

---

[4] The Court notes that another employee, Pat McCandless, was also accused of cursing a patient. Ultimately, McCandless received a verbal warning, rather than termination. (Brewer Dep. at pp. 180-89; *id*. at Exs. 12-14.) Although an employee witnessed McCandless cursing the patient, Brewer testified that the facility was unable to substantiate the accusation because the witness could not identify the time-frame in which the misconduct occurred. (*Id*. at pp. 184-85.) Unlike the Jackson investigation, Northport did not complete an abuse investigation report during the McCandless investigation. (*Id.* at Exs. 12-14.) The circumstances surrounding the McCandless matter provide additional evidence of pretext.

As an initial matter, this Court notes that it must view "all the circumstances" surrounding the challenged "conduct in context, not as isolated acts ...." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citations omitted). Thus, both the employee and daily patient comments viewed together were sufficiently "severe or pervasive" to sustain Jackson's harassment claim. In sum, the conduct about which Jackson complains constituted more than "simple teasing, offhand comments and isolated incidents." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001). However, even if the Court were to examine the employees' racist comments independently from the patient comments, this Court is satisfied that Jackson's harassment claim is actionable.

1.     **Employees' racist comments**.

"'[A] working environment heavily charged with ethnic or racial discrimination' is relevant to the issue of on-the-job racial harassment and discrimination against a particular individual." *Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991) (citation omitted). Northport argues, however, that the employees' racist comments were not sufficient to satisfy the "severe or pervasive" requirement because the comments were too infrequent and isolated.

The Court disagrees. Jackson heard at least ten co-workers make racist comments, some of whom did so on more than one occasion. Moreover, during her employment, Jackson heard employees discussing the racist comments made by her co-workers. "[O]ur circuit has held that 'the fact that many of the epithets were not directed at the plaintiff is not determinative' of whether a work atmosphere is polluted with racial discrimination." *Busby*, 931 F.2d at 785 (citation omitted).   Accordingly, Jackson has presented enough evidence to create a genuine

16

issue of material fact regarding whether Northport was "polluted with racial discrimination." *See Busby*, 931 F.2d at 785 (finding that the district erred by excluding evidence about racial comments plaintiff did not overhear and which were not directed at her).  Because Jackson learned of the comments <u>during</u>, not after, her employment, this is not a case where the comments "could not have contributed to [Jackson's] subjective view of a hostile environment." *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995).

Northport next argues that the employees' racist comments were not sufficiently "severe or pervasive" because Jackson purportedly failed to allege any physically threatening or humiliating behavior, nor did she claim that the harassment interfered with her ability to perform her job.  Northport's argument is without merit because Jackson need not establish <u>each</u> of these factors to satisfy the "severe or pervasive" requirement.  Rather, the Court must

> look[ ] at all the circumstances. These <u>may include</u> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, <u>no single factor is required</u>.

*Harris*, 510 U.S. at 23 (emphasis supplied).

Considering all of the circumstances, Jackson satisfied the "severe or pervasive" requirement.  She testified about daily and unquestionably racist comments.  Thus, rather than infrequent and "merely offensive" utterances, Jackson established frequency, as well as severity. Jackson also testified that the comments often drove her to tears and hurt her feelings.  (Jackson Dep. at pp. 106, 113, 126, 169, 307, 310-13.)  Such testimony constitutes evidence that Jackson found the slurs humiliating.  Certainly, Northport does not contend that comments about blacks

being made for the outside and unfit to live indoors were not objectively humiliating. Additionally, after a supervisor made a slur, Jackson became so disturbed by the comment that Northport ultimately disciplined her for "belligerent behavior." (Jackson Dep. at pp. 126-27 & Ex. 10.) Thus, Jackson demonstrated that the slurs unreasonably interfered with her work performance. Having provided evidence that she met most of the factors that courts should consider when analyzing this issue, Northport's challenge on the "severe or pervasive" requirement fails.

As a fallback argument, Northport next argues that it cannot be held liable for any harassment about which it was unaware. Northport points out that Jackson failed to report some of the racist comments she overheard. This argument fails for several reasons. First, Jackson did reported some of the slurs to management. *See Hudleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir. 1988) (noting that employer knowledge can be establish by showing that the employee complained to management) (citation omitted). Subsequently, however, Jackson noticed that Northport failed to respond to her complaints. (Jackson Dep. at pp. 129-30, 166-67.) She also testified that she did not report some comments because she feared for her job. (*Id.* at pp. 106, 115-16.) Thus, Jackson's failure to report all of the comments is not fatal to her claim. Moreover, Brewer testified that she overheard rumors about employee use of racial slurs. (Brewer Dep. at pp. 162, 164-65.) Consequently, Northport was certainly on notice that employees used racial slurs in the workplace.

Finally, Plaintiffs provide sufficient evidence from which a fact finder could determine that racial harassment was "pervasive enough to charge the employer with constructive knowledge." *Vance v. Southern Bell Te. and Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir. 1989).

18

The record is replete with evidence that at least one Northport employee wore a confederate flag shirt under her uniform, that Northport employees made disparaging comments about Mexicans, and that Northport employees frequently used the word "nigger." (*See, e.g.,* Allen Dep. at p. 62; Ivory Dep. at pp. 16, 39-40, 42, 147; Cherry Dep. at pp. 49-50; Hughes Dep. at pp. 71, 76, 108; Lewis Dep. at pp. 85-87, 115-16, 126-27, 220-22.) Accordingly, Northport cannot avoid liability, as a matter of law, by claiming the facility was unaware of each and every comment.

### 2.   **Patients' comments**.

Had Jackson been unable to proceed based upon the employee comments, she would still have an actionable claim for the racial comments made by the patients. Northport is mistaken when it contends that racist comments by elderly sick patients are not sufficient to sustain a hostile environment claim, as a matter of law. Obviously, the 2001 Fifth Circuit Court of Appeals case upon which Northport relies, *Cain v. Blackwell,* is not dispositive. *See* 246 F.3d 758. Even if the case were dispositive, the facts of *Cain* do not compel a finding that in all instances racist comments by elderly sick patients do not constitute harassment. In *Cain*, a home health care attendant complained about a male patient, who repeatedly propositioned her for sex and called her disparaging names. 246 F.3d at 759. The elderly patient suffered from Parkinson's disease, Alzheimer's disease, and had been declared legally incompetent. *Cain*, 246 F.3d at 759. After refusing reassignment to another patient, the plaintiff sued for sexual harassment. *Id*. at 759, 760. Rather than find that sick elderly patient comments do not constitute harassment *per se*, the Court held that the patient's comments did not constitute sexual harassment given the "unique circumstances" of the case, including the home health care

environment, the patient's age and his "obviously impaired" mental condition. *Cain*, 246 F.3d at 750-61.

Unlike *Cain*, Northport has not established that the patient slurs in the present case were made solely by individuals who are "obviously impaired." Even if Northport could do so, the facility cannot rely on the patients' mental illnesses to avoid liability. While the patients' impaired mental condition may indicate a lack of intent to harass, "the actor who engages in the [challenged] conduct need not have the intent to create an abusive working environment." *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111 (8th Cir. 1997).

Northport next seeks to avoid liability for the patients' comment by relying on the affidavit of Dr. Dave M. Davis, who commented on the inability of nursing homes to control patient behavior. Dr. Davis is a psychiatrist who opines that the behavior about which Jackson complains "is not at all unusual in a population of such elderly residents" because such patients often exhibit personality disorders and experience feelings of helplessness, insolation, abandonment and disinhibition. (Davis Aff. at pp. 2-3.) Because of these problems, nursing homes often have difficulty controlling patients who use slurs and engage in other types of verbal abuse, testified Dr. Davis. (*Id*. at pp. 4-5.) This lack of control is pivotal, agues Northport, because liability for harassment by non-employees is, for the most part, premised on the employer's ability to control the person making the offensive comments. *See* 29 C.F.R. § 1604.11(e) (noting that the EEOC "will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of ... non-employees").

Such evidence does not provide the basis for a finding that the comments of sick elderly

20

patients are insufficient to sustain a hostile environment claim <u>in all instances</u>, nor in this particular instance. *See Crist*, 122 F.3d at 1110-12 (rejecting employer's argument that it was not liable for harassment by mentally ill group-home patient whom employer could not control.) Despite the inability to control their patients, nursing homes clearly control the working conditions of their employees and have the "ability to alter those conditions to a substantial degree." *Id.* at 1112.

Both Northport and The Alabama Nursing Home Association ("Association") urge this Court to refrain from penalizing nursing homes, that board racially abusive patients, because such institutions provide a much needed benefit to society: caring for persons who are unable to live independently.  The position championed by Northport and the Association would

> essentially permit[ ] a residential care provider like [Northport] to tell its employees that they assume the risk of working with [mentally] disabled individuals and that [these employees] have no right to expect a [harassment free] working environment.

*Crist*, 122 F.3d at 1110. On the other hand, strict liability on the part of such employers for the conduct of its residents would simply constitute a swing to the opposite extreme. *Id.*

The approach reached by this Court today does not constitute "a swing to the opposite extreme," however. *See id.*  The Court's finding on the "severe or pervasive" element of Jackson's harassment claim in no way imposes a strict liability standard.  Under federal law, an employer may avoid liability for racial and sexual harassment by non-employees if the employer can establish that it "t[ook] immediate and appropriate corrective action" upon learning of the challenged conduct. *See* 29 C.F.R. § 1604.11(e) (discussing employer liability for sexual harassment by non-employees).  Thus, if nursing homes and other residential care facilities can establish that they took "immediate and appropriate corrective action," in response to patient

21

harassment of employees, these facilities will not be subject to liability simply because they happen to care for unruly patients.

Indeed, in the present case, Northport contends that it took "immediate and appropriate corrective action" to remedy the problem.  Northport points out that it counseled patients, implemented behavior modification programs and discussed the racial slurs with the patients, as well as their families.   Northport notes that discharging the patients was not a viable option because federal and state laws prevent nursing homes from discharging patients, except under narrowly defined circumstances. *See* 42 U.S.C. § 1395i-3(c)(2)(A) (discharge limited to, *inter alia*, the patient's improved health or inability to pay, the facility's inability to meet the patient's needs, the health and safety of others, etc.);  Ala. Admin. Code § 420-5-10.06 (mirroring the federal legislation).  Because such narrowly defined circumstances were not present in the instant case, Northport contends that it took advantage of all <u>viable</u> corrective measures.

Notwithstanding these considerations, Northport's failure to reassign Jackson indicates that Northport did not consider all viable corrective measures. *See Ligenza v. Genesis Health Ventures of Mass.*, 995 F. Supp. 226, 230 (D. Mass. 1998) (rejecting argument by long term care facility that it was not liable for harassment by patients because of patient discharge restrictions imposed by federal and state law); *Crist*, 122 F.3d at 1112 (noting that the employer had the ability to alter the employees' working conditions).  Brewer testified that reassignment, of either the patient or the CNA, was a proper method for addressing complaints about racial slurs from patients. (Brewer Dep. at pp. 27, 44, 73-74.) Indeed, Brewer added that Jackson could have been reassigned had she requested such. (*Id*. at pp. 42-44.)  Brewer further admitted that Northport reassigned black CNA, Naqueta Gibson, after she complained about patient use of

racial slurs.  (Brewer Dep. at pp. 28, 31, 33, 42.)  Yet, Northport presents no evidence that

Jackson was reassigned in response to her complaints.  (*See id*. at pp. 33-34, 63.)  Jackson's

testimony that she asked for reassignment creates a genuine issue of material fact on the issue of

whether Northport took "appropriate corrective action."  *See* 29 C.F.R. § 1604.11(e).

Northport attempts to mitigate its liability by pointing out Jackson's admission that she

was eventually "separated" from the residents about whom she complained.  Even if the

separation brought an end to the barrage of slurs, Jackson testified that the separations

"eventually" occurred after she complained, not immediately as required by the law.

Northport counters by stating that reassignment is not "usually the first or best solution

because a large percentage of the [patient] population is demented and some percentage of the

population has behavior problems ...."  (Def.'s Br. in Opposition to Summ J. by Lewis, at pp. 15-

16) (citing Estes Dep. at pp. 48-49.)  Moreover, points out Northport, Jackson admitted that

reassigning black CNAs would be unfair to white employees, who would presumably have the

sole responsibility for attending abusive patients.  (Jackson Dep. at pp. 215-26, 218.)  Finally,

argues Northport, reassignment may be inappropriate because "the employee may generally like

her group of residents and the residents may like and be used to the employee."  (Estes Dep. at

pp. 49-50.)

These arguments are disingenuous at best.  First, Jackson cried in response to racist

patient comments and requested reassignment.  Thus, she obviously was unwilling to suffer racial

abuse no matter how much she may have liked some of her patients.  *But see Cain,* 246 F.3d at

760 (where plaintiff refused reassignment away from the offending patient).  Second, reassigning

black CNAs to patients other than those like Smith, Blalock and Naramore does not insulate the

black CNAs from caring for <u>all</u> abusive patients: only the patients who are <u>racially</u> abusive. Finally, Northport reassigned Naqueta Gibson. Thus, reassignment was undoubtedly a viable alterative. To the extent that Northport contends reassignment was not necessarily the "first or best" option, the jury should decide whether such an option would have been suitable in the present case. *Crist*, 122 F.3d at 1112 n.5 (cautioning that the proper "inquiry is not whether [the nursing home's] response was the <u>best</u> course of action possible, but rather whether it was appropriate in light of all the circumstances") (emphasis in original).

E.      <u>Negligent Retention and Supervision Claim</u>.

Northport argues that Jackson's negligent supervision and retention claim must be dismissed because she does not allege an underlying "tort." *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999). In support of this argument, Northport relies on *Stevenson v. Precision Standard*, a case in which the plaintiff claimed she was sexually harassed by a co-worker and she sued both the employer and employee for various state law torts, such as assault and invasion of privacy. The plaintiff also included a negligent supervision and training claim against her employer. 762 So. 2d 820. After trial, the jury returned a verdict for the individual defendant on all claims, but found the employer liable on those same claims. *Stevenson*, 762 So. 2d at 822. The Alabama Supreme Court reversed the verdict against the employer on plaintiff's negligent supervision and training claim. *Stevenson*, 762 So. 2d at 825. The Court reasoned that the "only means of attaching liability to [the employer] would be to prove "<u>wrongful conduct</u>" by the employee. *Stevenson*, 762 So. 2d at 824-25. Because the plaintiff failed to prove any wrongful conduct by the employee, she could not "attach liability" to the employer. *Id.* at 825

24

(noting that the employer could not have ratified conduct the jury determined never happened). Thus, the inconsistent verdict against the employer for negligent supervision and training could not stand, held the Court. *Id.* at 825.

This Court is not convinced that the Alabama Supreme Court has relegated negligent supervision and retention claims solely to cases where the plaintiff can establish an "underlying tort." Only once in *Stevenson*, when describing another case, does the Supreme Court use the term "underlying tort." *Stevenson*, 762 So. 2d at 824 (citing *Potts v. BE&K Constr. Co.*, 604 So.2d 398 (Ala. 1992)). Rather, at repeated intervals, the Court explained that a negligent supervision claim must be premised on the employee's underlying "misconduct," "wrongdoing," or "wrongful conduct." *Stevenson*, 762 So. 2d at 824-25.

Thus, "underlying wrongful" conduct in the form of a Title VII violation is sufficient to support Jackson's negligent retention and supervision claim. No reasonable basis exists for a finding to the contrary. After all, "[m]ost civil rights actions are essentially claims to vindicate injuries to personal rights." *Everett v. Cobb County School Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998) (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661, (1987) (noting that an "action for discrimination is one for 'fundamental injury to the individual rights of a person'")). Therefore, summary judgment is not appropriate on the negligent supervision and retention claim.

## II. PLAINTIFF SHARON LEWIS

In her last amended complaint, Plaintiff Sharon Lewis ("Lewis") asserted four claims: 1) retaliation for purported reduction in hours, 2) constructive discharge because of purported reduction in hours, 3) hostile work environment claims based upon race, and 3) negligent

retention and supervision.  (Doc. 27.)  However, Lewis has subsequently agree to dismiss the retaliation and constructive discharge claims.  (Doc. 108 at p. 18.)  Therefore, only two of her claims are currently at issue: hostile work environment and negligent supervision and retention. [5]

A.   Employee and Patient Racial Slurs.

Lewis was employed at Northport as a CNA from late 1996 through December 1, 1998. In her deposition, Lewis recounted specific incidents involving employee and patient use of racial comments.  (Lewis Dep. at pp. 85-87, 115-16, 126-27, 220-22.)  Like Jackson, Lewis testified that Naramore called Lewis nigger on a daily basis.  (Lewis Dep. at pp. 82-83.)

Another patient, Della, also called Lewis a nigger on more than one occasion. [6]  (Lewis Dep. at pp. 83-84.)  Approximately three months after Lewis began working for Northport, Della called both Lewis and a white co-worker nigger.  (*Id.* at pp. 85-86.)  In response, the co-worker, whose name is Tammy, stated that she was not a nigger, but instead she was the same color as Della, who is white.  (*Id.*)  Lewis reported the comment to Northport.  (*Id.* p. 87.)  After Lewis complained about this incident, Tammy never used the term again. (Lewis Dep. at pp. 86-87.)

Like Jackson, Lewis overheard the comment by the co-worker who said she had been cleaning her yard and had become as "funky as a nigger."  (Lewis Dep. at pp. 221-22.)  Lewis

---

[5]  Lewis's negligent supervision and retention claim survives for the same reason Jackson's claim survives.

[6]  Presumably this patient is the same Della about whom Jackson testified.  Northport claims that Della was discharged from the facility prior to Lewis' employment.

was also aware of other racist comments through conversations with her co-workers. Indeed, another co-worker told Lewis "that a lot of racial things were being said" by Northport employees. (Lewis Dep. at pp. 226-28, 224-25.)

Near the end of Lewis's employment, the final race related incident involving an employee occurred. On a Sunday, in late September 1998, Lewis arrived at work and reported to the nurse's station where the CNA's received a report regarding the previous night's activities. One of the reports involved a black resident, Annie Phillips, who had complained because she believed that her medication was causing her skin to darken. According to Lewis, RN Ruby Frey responded to the report about Phillips by making several derogatory comments such as "God cursed her to be black" and the dark skin "wasn't [Ms. Phillips'] problem. It was God that turned her black." (Lewis Dep. at pp. 115-16.) After Frey's comment, several other employees laughed and began discussing possible methods for lightening Ms. Phillips' skin color. (Lewis Dep. at p. 115-19.) On Sunday, when the employees assembled for the morning report, Frey indicated that she had discussed her comments with Jeff Burchfield, the Facility Administrator, and Brewer, the DON, and neither of the them had a problem with the comments, according to Frey. (Lewis Dep. at pp. 126-27.)

However, when an unidentified employee reported the incident later that Sunday, Burchfield and Brewer came to the nursing home and began an investigation that same day. Upon Brewer's arrival, she observed that Lewis was upset and looked as if she had been crying. (Brewer Dep. pp. 88-89.) During the investigation, Lewis complained about Frey's comments and the comments about lightening the patient's skin. Lewis also told Brewer that "the word nigger was used constantly" at Northport. (Lewis Dep. at pp. 139-40.) Brewer then interviewed

27

some of the persons Lewis identified as either laughing and participating in the Frey

conversation or witnessing the conversation.  At least one of those individuals denied that Frey

had made any racial statements.  (Elmore Dep. at Ex. 4.)  Ultimately, Frey admitted she made the

comments and was terminated.  In contrast, Northport officials concluded that the other persons

named by Lewis either did not intend their comments as derogatory or their participation could

not be confirmed.  (Elmore Dep. pp. 36, 41, 51-52, 78-79.)  Therefore, none of the other

participants were disciplined: not even the employee who denied that Frey made the offending

comments.  (*Id.*; Burchfield Dep. at p. 36.)  After the Frey incident, Lewis did not hear any other

employees make racist comments.  (Lewis Dep. at pp. 154-55.)

In her deposition, Lewis testified that "[t]he N word is regularly used at Cordova

Healthcare everyday.  Not only with the patients, but some of the employees."  (Doc. 84, Lewis

Dep. at pp. 84, 139-40.)


B.      Hostile Work Environment Claims.

As with Jackson, Northport argues that Lewis fails to make out a prima facie case for

discrimination because the conduct about which she complains was not "severe or pervasive."

Relying on *Cain*, Northport again argues that the patients' comments are not actionable.  *See* 246

F.3d at 759.  Without the patients' comments, Northport contends that Lewis has no claim

relating to the employee comments because she proffered no evidence that, except for the Frey

incident, Lewis was present during employee use of racial slurs.  The Frey incident alone does

not satisfy the "severe or pervasive" element of her claim, argues Northport.  In the alternative,

Northport argues that it cannot be held liable for the employee conduct because the company

took all possible remedial steps to remedy the problem by discharging Frey.

As discussed in the analysis of Jackson's claims, the employee and patient comments viewed together were sufficiently "severe or pervasive" to sustain the harassment claim. Like Jackson, Lewis was subjected to racist comments by employees, along with daily racist comments by patients. These comments went far beyond "simple teasing, offhand comments and isolated incidents." *Clark County Sch. Dist.*, 532 U.S. at 271. Also like Jackson, the harassment claims by Lewis survive even when the employee comments are analyzed separately from the patient comments.

As discussed above, the patient comments are actionable unless Northport can show that it took "immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e). As in Jackson's situation, Northport never seriously considered or attempted reassignment, despite Lewis' repeated requests. (*See* Lewis Dep. at p. 202.) Thus, Northport cannot avoid liability, as a matter of law, for the harassment claims based upon the patients' comments.

Northport argues that Lewis cannot go forward with her employee based harassment claims because she did not overhear the comments on enough occasions to satisfy the "severe or pervasive" requirement. The Court does not agree with Northport's argument. A plaintiff does not have to witness every disparaging comment by her co-workers to survive summary judgment. *See Busby*, 931 F.2d at 785 (noting the significance of an "environment heavily charged with ethnic or racial discrimination"). In the present case, not only did Lewis testified about three incidents where she actually overheard employees make racially derogatory comments and/or use racially derogatory terms, (Lewis Dep. at pp. 84-85, 86, 115-20, 220-22), but Lewis also testified that, while she was employed at Northport, others told Lewis about racist

29

remarks and the use of the word "nigger" by co-workers.  (*See* Lewis Dep. at pp. 226-27, 224-25.)  Like Jackson, Lewis either overheard or was aware of numerous employee racial comments during her tenure, thereby "contribut[ing] to [her] subjective view of a hostile environment."  *See Edwards*, 49 F.3d at 1522.  Thus, Northport is not entitled to summary judgment on Lewis' employee based harassment claims.

Finally, Northport argues that the facility is not liable for the employee slurs because of its "immediate and appropriate corrective action" after the Frey incident.  Northport discharged Frey and Lewis admitted that she did not hear any more racial comments after Frey's discharge.

The Court is not persuaded by this argument.  Prior to the Frey incident, both Jackson and Lewis complained about the racial slurs.  Moreover, Brewer admitted that she had heard rumors about employees using racial slurs in the break room.  (Brewer Dep. at pp. 164-65.)  Her response was to tell the employees that they "didn't need to be saying that."  (Brewer Dep. at pp. 165.)  Reasonable persons could find that this response did not constitute "immediate and appropriate corrective action," particularly when the slurs continued until near the end of Lewis's two year tenure.  Northport cannot rely on its eleventh hour response to the Frey incident to absolve itself of liability, as a matter of law.  Even in the aftermath of the Frey incident, Northport did not discipline the employee who lied by claiming that Frey did not make racial slurs.  Accordingly, Northport is not entitled to summary judgment with respect to the employee based harassment claims.

### III. PLAINTIFF ELIZABETH BUSH

Plaintiff Elizabeth Bush ("Bush") initially asserted claims for: 1) retaliation, 2)

constructive discharge, 3) hostile work environment based upon race, and 4) negligent retention and supervision.[7]  Bush has agreed to voluntarily dismiss her retaliation and constructive discharge claims.  Therefore, only her claims for hostile work environment and negligent supervision and retention are at issue.

Bush was a CNA who worked at Northport for approximately six months.  During Northport's investigation of a complaint that she had hurt a patient, Bush resigned.  (Bush Dep. at pp. 16, 114-15, 118.)  Her complaints center around racist comments made by patients.

Bush complains about two patients.  First, Willie Kullick called Bush a "nigger" on five occasions, though Bush can only remember the specifics about three occasions.    (Bush Dep. at pp. 18-38.)   During one incident, Kullick told Bush that he did not "want [her] nigger hands on [him]" and that he was going to "kick her black ass." (Bush Dep. at pp. 29, 31-32.)  In response, Bush complained to Northport management about Kullick. (*See id.* at pp. 18-38)

Another patient, Hobert Jones, called Bush a nigger twice. (*Id.* at pp. 38-41.)  On one occasion, Jones talked about how he always tried to help "you people" and he complained that "niggers ... always have something to say back to us [white people]." (*Id.* at pp. 40-41.)  Bush then left the room because she "couldn't take it anymore" and later reported Kullick to Northport management. (Bush Dep. at p. 41-42.)  In her deposition, Bush testified that she cried often after leaving the facility, due to her discouragement about the racial problems.  (Bush Dep. at p. 128.)

Northport argues that Bush fails to make out a prima facie case for harassment because she does not allege that the patient comments were humiliating, physically threatening, or

---

[7]  Bush never filed an EEOC charge.  Therefore, her federal discrimiation claims were asserted solely under Section 1981.

frequent enough to satisfy the "severe or pervasive" requirement. As an initial matter, the Court notes that a plaintiff who alleges racial harassment must establish that the challenged conduct was both <u>subjectively</u> and <u>objectively</u> "severe or pervasive." *Mendoza*, 195 F.3d at 1246. This Court is satisfied that Bush has established that she subjectively viewed the comments by Kullick and Jones as "severe or pervasive." Bush testified that she left Jones' room because should could no longer tolerate his racist comments. She also testified that she complained to Northport officials about the conduct and she cried many nights after leaving work.

However, this Court has no choice but to find that Bush does not meet the Eleventh Circuit's standard for establishing an <u>objectively</u> "severe or pervasive" hostile environment. Bush does not recount incidents of such magnitude that she satisfies the severity factor. Nor does she complain that, while she was employed at Northport, she was aware that employees and/or patients made frequent or repeated racial slurs. Thus, she has no basis upon which to claim that Northport was "polluted with racial discrimination." *See Busby*, 931 F.2d at 785. Bush complains solely of anywhere between five to seven comments over a six month period. In a recent Eleventh Circuit case, the Court held that plaintiff met the "severe or pervasive" requirement where she recounted "roughly fifteen separate instances of harassment over the course of four months." *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000). Bush's five to seven comments over a six month period do not compare to the fifteen incidents that occurred in *Booker T. Washington* over a much shorter period of time. Accordingly, Bush's harassment claim is due to be dismissed. Without a claim for an underlying wrong, her negligent supervision and retention claim is also due to be dismissed.

## CONCLUSION

For the reasons spelled out above, Northport is entitled to partial summary judgment on: 1) the retaliation and promotion claims made by Jackson, 2) the retaliation and constructive discharge claims made by Lewis, and 3) all of the claims made by Bush.

The Court will enter an order embodying these conclusion and granting the appropriate relief.

DONE this ___3⟨st⟩___ day of ___March___, 2002.

_____
Chief United States District Judge
U. W. Clemon

33